Case number 16-5329. Bread for the City Appellant v. United States Department of Agriculture et al. Mr. Killian for the Appellant, Ms. Lilly for the Appellees. Good morning. Good morning, Your Honors. May it please the Court. Section 2036 takes away USDA's discretion over spending on the Emergency Food Assistance Program. Spending on that program is mandatory, and the amounts of spending on that program are mandatory as well. USDA must allocate a portion of the annual SNAP or food stamp appropriation in spending on TFAP. In 2014, Congress amended this section to increase the fraction that is spent on TFAP. The dispute in this case is about how much was that increase. The structure, the text, and the purpose of the statute all show that the increase was at least $250 million more than USDA has been spending on it. I'd like to start with the structural point, because I think that's where the government's brief seems to disagree with us the most. Subparagraphs A, B, C, D, and E, and if Your Honors want to follow along, it's on pages 3 and 4 of the blue brief where we show the sort of before and after after the amendment. Subparagraphs A, B, C, D, and E, these five subparagraphs, are all independent spending duties. They all share the same opening clause, USDA, excuse me, the Secretary, shall carry out with the following numbers. Some of these subparagraphs use numerals, and some of them use formulas with words. Some of them cover a single fiscal year, and other of them cover many fiscal years, but the point remains that they are all spending instructions. Now, for four of these fiscal years, 15, 16, 17, and 18, they are repeated in C and D. But that doesn't change how the subparagraphs function. That's the structural point. D is clearly a spending instruction. I think all parties in the district court agree with that. The extra amount in sub-subparagraphs, you know, I through IV, is listed only in D. So if that amount is to be spent, D must require it. And C is also a spending instruction. It is a spending instruction for nine fiscal years. Clearly was that before the amendment in 2014. As we show, C originally went from 2010 through 2012, and that's where the statute stopped. What Congress did in the amendment is that it extended the cutoff date. It erased 2012 and extended that to 2018. That simple change of the cutoff date didn't change the function of subparagraph C.  Now, the government's theory in this case is that C somehow turns off in fiscal years 15 through 18. But there's nothing I see in the text of C or D that actually turns it off. In fact, what the government's theory is is ultimately contrary to Congress' amendment in 2014 that changed the year 2012 to 2018. The government wants to limit C as if it stops in 2014. Well, do we have to read it out, or can you read it quite naturally as simply having a specific addition, identifying additions for the years 2015 through 2018, so we still have the C base amount, and then we say for these years we're going to add this amount each year? That, I think, is the textual point of disagreement. Once you agree with me that C and D are both spending instructions, the question is, what amount does C require and what amount does D require? And I think your question, Judge Millett, is what amount does D require? Does D require just $50 million, as Judge Leon held below, or does it require $327 million? And to answer that, we think that's a plain textual interpretation. D says not in addition to the amount of C, spend $50. It says spend the sum obtained by adding $250 million and $50 million. In addition to and the sum obtained by adding are not synonymous. And, indeed, Judge Leon's theory that the entire introductory clause of D, the sum obtained by adding the total dollar amount, renders that basically superfluous. Because, remember, Congress amended C and D simultaneously. Congress didn't need to include a reminder at the beginning of D that says, hey, by the way, the amount we just told you under C to spend, that $250, you've still got to spend that and then an additional $50 million. So, in your interpretation, are you reading D to mean that for each of fiscal years 2015 through 18, in addition to the amount in C, the sum obtained by adding the total amount specified in C, namely $277 plus $50, is the amount for 2015? I think that gets to the same result, Your Honor. But the extra words in addition to aren't necessary to make that point. Well, but what I'm trying to get at, you're making a plain text argument, aren't you? Yes, absolutely. And the government's interpretation is essentially that that language that I added in my question means that you just take C as $277 and you add the $50 million in D. And that's the sum referred to in D. So, again, this is another point that Judge Leon made below, and I think that he's confusing two different sums on this interpretation. The sum of following and complying with C and the sum of following and complying with D isn't the sum that D itself refers to. Because this gets back to that point that I started with and why it's so fundamental to my argument to show that each of these subparagraphs is an independent spending duty that is discharged only by complying with the amount of money that is required under that specific subparagraph. So there isn't a need to say, in addition to, because D itself is an independent spending duty. When you do the math, the sum obtained by adding the total dollar amount mentioned in C plus 50, you get $327 million. Back in A-1, Congress envisions A as an asingular dollar amount for each year. And your reading would contradict that singular reference by having essentially two numbers for the years 2015 through 2018. And that would be contrary to the rest of the structure, where it's this year one number, this year one number, this year one number. Well, but our view is that the number is 604, so that is a dollar amount. You just get there through complying with the duty of C. No, but your position is that there's two separate authorized amounts, the C amount and the D amount. That's what you just said. They are both distinct spending authorizations. And my point is that structurally, Congress seemed to think that there was a single amount through the provisions below. So why isn't the better way to read D as simply a more specific direction as to those three, sort of a subset. We have the general and then we have the subset. And as to those three, you're going to get this extra kicker. A couple of responses to your question, Judge Milley. I want to get to that specific and general point in a moment as well, because I think that's an important one to address. But you're not with me on the idea that the total dollar amount is the 604 million that's C. And I understand that point. But that does essentially render all of the introductory phrase of D superfluous. Indeed, on this theory, for each of the fiscal years, it would just say, for fiscal year 15, 50, for fiscal year 16, 40. There's no reason to make a cross-reference like that. Unless Congress was – let me step back. The reference to the sum obtained by adding is what the statute requires. We're sort of divining congressional intent and coming up with a rational reason why Congress did this. Because as long as it's rational, we do what the text says. So we're surmising that Congress wanted the expenditure of extra funds and did so by saying that for 15 through 18, there is an additional sum obtained by adding the 250 and the 50. So they add together. Now, Your Honor mentioned a point a moment ago that there's maybe a general provision in C and a specific provision in D. The canon of the specific governing the general doesn't come into play in this case. We resort to that when there's a conflict between two provisions. And when there's simply a little bit of overlap, like there is here, where there's four fiscal years that are repeated in C and four fiscal years that are repeated in D, then the first question is, is there a conflict? Is it irreconcilable? Is it impossible for USDA to comply both with its duty under C and with its duty under D? And the answer is no, because it could comply with both of these. I don't read the Supreme Court decision in RADLEX as requiring impossibility, that it's not like a— I think irreconcilability would be how I understand it. In other words, and I was thinking of Connecticut National Bank versus Jermaine, where the case about the appellate jurisdiction statutes where the Supreme Court said, yeah, there's a little bit of overlap. There's a lot of ways to get in a federal court, but the point is we're not going to ignore the plain meaning of words in C or D in this context or the appellate jurisdiction statutes as it was in Jermaine unless there's a conflict, unless we can divine and see that Congress had something so specific in mind that it meant to sort of— Well, this is a little—I mean, this is—we're dealing here with— we as a court are trying to figure out how much money Congress wanted spent and the Constitution is quite clear that Congress decides what money to spend. Absolutely. And so if we were to just find, you know, sort of 50-50 ambiguity here, there's one way to read it, quick reading, the other one, you have one, you have good arguments on both sides. Is there any sort of background principle in this specific context of spending authorizations that a court should apply? No, Your Honor. I think when there's—when a court in a situation like this with a mandatory duty under a writ of mandamus action like this finds ambiguity, it's still up to the court to decide what the correct result is, what the text of the law requires. But I want to resist the point that the mere overlap of four fiscal years amounts to ambiguity. It may be a little bit peculiar that Congress went about this way, but as the Supreme Court has said in other cases like Lamey v. U.S. Trustee, the fact that Congress chooses an odd way to accomplish its result doesn't make it ambiguous. You could still follow the plain meaning of C. You could still follow the plain meaning of D. And when you put those together in sort of a Venn diagram— But if one thought it were ambiguous, if one thought it were unclear whether Congress was simply clunky or used more words than necessary, but the meaning still is, look, 2010 to 2018, here's our general framework. And for these three years, we want you to add a kicker onto that number we just mentioned. I would direct the court then to the purpose of the sort of the evident purpose of Section 2014. Before we get to that, if I thought there were ambiguity— Right, semantic ambiguity. I understand what I'm saying. There's no deference to the government. There's no deference to the government in this case. And so shouldn't courts, as a matter almost of separation of powers, against a higher spending amount, err in favor of spending, assuming Congress meant to spend less? It's troublesome for us to say, well, we're going to assume it was more rather than less. The separation of powers concern, I believe, goes to the appropriations, the power of the purse, not to the duty to spend. Those are two different things. This Court can declare what the law is, and Congress can still retain control over the power of the purse and its ability to appropriate funds. So in this instance, I mean, I think the separation of powers concern you're articulating is a valid one, but it deals with the sort of subsequent appropriation, not with the administrator's or the USDA's actual duty. What does the law require? Now, if you think there is semantic ambiguity, Judge Millett, then I would point the court to the purpose, the evident purpose of the amendment in 2014, which was to increase spending here in a way that reasonably compensated for the amount of money that was being taken away from food stamps. And in that kind of a context, I think it's, you know, it makes a little bit more sense that, and we've explained this all in the brief. I won't go through the whole legislative process again for the Court, but it makes a little bit more sense, and it's certainly rational to believe that Congress dedicated an extra $1 billion to TIFA. But why isn't, because under your reading, under the government's reading, you have just sort of this steady increase in payments tied to inflation, and then even under your purpose theory, you have the extra kicker for those years that could address your purpose concerns. But under your provision, we have this sort of steady, and then we have this huge bump. Well, we end up in the exact same spot, though, at the end. Plummet back down. I concur. We do end up in the exact same spot. In 2019, the amount is going to be approximately, you know, $327, whatever inflation is in the next couple of years. Our theory, as we explained, is that legislators act in a fairly self-interested way here, and one way to get around CBO scoring is to pack in massive spending increases in the first four years of a bill, because in the last year, Congress, excuse me, the CBO scores long-term deficit spending based on the amount that's in the end. So, you know, the important point about the drop-off, Your Honor, is that Judge Leon's theory gets us to the most radical drop-off of only $15 million spent on TFAP in 2019. I think the government was sort of responding to the almost absurdity of that by revising its argument on appeal here to try to come up with a theory that essentially says C does no work. C no longer is a spending instruction after 2015. And as I stated a few moments ago, I think that it is directly contrary to Congress's action in 2014 to amend subparagraph C and actually extend that cutoff date. The government hasn't grappled with that in its explanation of the case. Now, I've used a substantial portion of my rebuttal time, but if the Court has any questions, I'd like to reserve some for rebuttal. All right. Thank you. Thank you. Good morning. Your Honor, as we explained in our brief, the USDA's interpretation of the amounts authorized for the TFAP program is straightforward. For fiscal years 2010 through 2018, subparagraph C sets out an inflation adjustment of a baseline amount, a $250 million baseline amount that's adjusted for inflation each year. And subparagraph D sets out a kicker, to use your words, Judge Millett, for each year, a modest increase of $50, $40, $20, and $15 million. Why wouldn't they just delete all that language in D and as part of C just go add for fiscal year 2015? It seems to me they have a fair point that we're rigging out the fact that there was a separate D section put here and that it has its own language. Your reading doesn't have any need for D. You would just take the four little Romanets and stick them under C. Well, Your Honor, that's what Congress did in subparagraph D. It said sum these, add the two numbers. And so it did so in the separate subsection of paragraph B because C was the inflation adjustment provision. And it made sense to do so for the subset of years to which the kickers applied. Except all the other A, B, C, D, and E's are independent spending authorizations. And so now you're saying D, even though it's set up like an independent spending authorization, in fact, is not. It's just an addition that could have been slotted under C. As is indicated by the overlap between C and D for those four years, the spending instructions for those four years are contained in two subparagraphs. And Congress did that because it wanted to preserve both the inflation adjustment, which had been set out in subparagraph C, and then to add the kicker as part of the compromise. Do you know or have any idea why it's a decreasing amount from one fiscal year, 2015 to 2018? Your Honor, I can't explain all of the congressional compromises involved in the Farm Bill, but we do know from the legislative history that there was significant back and forth about how much to cut SNAP and, therefore, how much to increase TFAP to accommodate it. And so the compromise in both the House and Senate bills was this sort of sliding scale. Just let them down gently? Is that the idea? I mean, why add $50 million in 2015? I think that Congress intended that to accommodate some of the cuts to the food stamp program. The theory was that there would be increasing need for the emergency food assistance that the recipients of these TFAP funds would receive, and so that would offset slightly some of the cuts to SNAP. I find it difficult to make any sense of the idea that Congress would add $50 million when, according to the plaintiff's theory, they added $277 million to the spending in the years prior to 2015. In the years prior to 2015, I believe it was sort of a constant $250 million adjusted for inflation. Which is $277 million, right? Yes, it was in 2015. Of course, that amount keeps getting adjusted. What I was trying to say is that I don't see the sense of the plaintiff's reading with respect to the 50, the 40, the 20, the 15, when Congress, according to the plaintiff's, has already added $277 million. That's their theory, isn't it? I think, Your Honor, it is suggesting that it would be odd to use a defined term of 50 when, in fact, Congress intended to double the amount. And the agency, Congress, the appropriators, CBO, agree with you that that is the incorrect reading of the statute. That the statute authorizes these modest increases over the baseline amount for fiscal years 2015 through 2018. And that no one else has been confused. The legislative history is clear. The text is clear. The subsequent appropriators understood what that meant. CBO in scoring this authorization understood what that meant. Of course, the reply brief has a nice response to your reliance on all those authorities, doesn't it? I mean, part of the problem is trying to understand exactly what's happening here. And you heard counsel at the end of his argument this morning give us a theory regarding the Congressional Budget Office. It sort of makes sense in terms of concerns about the debt limit. But what I'm having trouble with is I simply don't know enough about the farm program and all the other monies that are coming in so that what Judge Randolph is focusing on seems odd, but maybe it isn't odd if we looked at the total picture. And neither brief addresses that. So we're just looking at this one amendment in 2014, trying to come up with a language that would support this additional language in D. Yes, Your Honor. And it's just odd that it's there if it only has the meaning you suggest. Your Honor, it is clear on the face of the statute and in the context of Congress's historical authorization for the TFAT program, and its subsequent appropriations, that it didn't intend to, in language that one might consider odd, to double, to increase funding for just this four years to unprecedented levels. This is what Congress said later, right? Yes, Your Honor. All right, but that's basically not relevant, is it? Well, it is, Your Honor, when Congress is charged with... And then all of a sudden woke up and understood that there's some implications here we didn't understand. Your Honor, if Congress was generous of heart to unprecedented historic levels, we would have expected to find some indication of it in the legislative history. Your premise is, based on a historical fact which neither brief supports, that this is a unique situation, et cetera. What we know from the briefs is there was a compromise between the House and Senate. Yes, Your Honor. And these numbers don't tell us anything about why they chose these numbers. So both sides saying the language is plain doesn't really help when, arguably, there are two possible and reasonable interpretations of this language. We think there's only one, Your Honor, and the conference committee report... Well, the problem I have with the government's position, and I thought it was interesting that the district court and the government aren't in sync here, but it's the overlap of the fiscal years. Yes, Your Honor. And the government's interpretation seems to ignore that. Seems to ignore that the... Well, just treating what Judge Millett was addressing with you, that D, if it's, as the government says, it would just say, D, and for fiscal year 2015, add $50 million. Yes, Your Honor. Or an additional $50 million. But it's not all this other language. Well, subsection C adjusts a baseline amount for inflation. D does not adjust those amounts for inflation. That is one potential reason. Because the cross-reference is C and says that's already been done, so we don't need to do it twice. Right. And so it is natural for Congress, where it wants to maintain that inflation adjustment for the eight-year period, but then for a subset to increase it slightly, to do so with these overlapping provisions that set out a fixed schedule of increases. There's nothing unnatural about doing it. It's just not what the statute says. I mean, your theory, the statutory language you're reading would have the statute have A, B, C, and then Romanets 1, 2, 3, 4, and E. There's just no point at all to the D clause that comes before the Romanets, correct? That does no work at all under your reading. We get $277 million from C, and then we add in 50 from Romanet I. Yes. That's all. There's no function surplus. I mean, we aren't supposed to let any word be surplusage, and here we're going to have, you know, I'm not counting that quickly, but 20 words or so being surplusage. No, Your Honor. In fact, the introductory clause of subparagraph D does the work of requiring the agency to add the inflation adjustment. But that's already in the Romanets for fiscal year 2015. That's already there. You don't need it. You don't need it in D. In D, Romanet I, there's no language that refers to addition, and so that work is done by the sentence, the introductory sentence to subparagraph D. But then you just need one word, add, for fiscal year, add, and you don't need all these other words. I mean, if you just read C by itself, you'd go, all right, $277 million. And then if you read D, if the years were different, say they were 2019 through something, you would go, okay, that's a separate amount. That's another spending authorization. Spend C, and D is an independent spending authorization. But not where the two are overlapping in the words of opposing counsel, where you have a subsection C, which refers to eight fiscal years of spending, and subsection D refers to a subset of those, and then refers back. It says don't stop there with the inflation adjusted amount. Add to it. And don't adjust those C amounts in the schedule. If Congress wanted to write the statute the way plaintiffs propose, if they wanted to, do it their way, isn't this exactly how they'd say it? No, Your Honor. If Congress wanted to double the amount for each of the fiscal years, it would, for instance, one of the ways it would do it, it would make clear that it wanted to double the inflation adjusted baseline amount and add a fixed amount. Well, but it doesn't want to do that for 2010 through 2018. It only wants to do that for 2015 through 2018. So it's still going to have C just as it is. And then it's going to say for 2015 through 2018, we want to do something special. We want to add more. That's what the statute does. Everyone agrees that. And the question is how much more it's adding in. And my concern is textually, you know, if there's a lot of language there, we just blow right past to have your view of how much we're adding in. Your Honor, we don't blow past anything in subsection D. Subsection D refers back to the amount and asks the agency to add to that amount this fixed schedule of increases. Or it says D, pay the sum obtained by adding the total dollar amount of commodities and this number here. Exactly. So if you read D, that gets you to $277 plus $50, correct? Yes. All right. So if D says pay $277 plus $50 for this year, and let's just assume you have to go down $40 and whatever. But it says do that for 2015, 2016, 2017, 2018. Pay that. Yes, Your Honor. That's an independently operating provision. But now you're saying C doesn't have any role for 20. Well, Your Honor, if you just had D, which I think is what you're suggesting that that's what Congress would do, then you'd have no baseline. You would have no inflation adjusted. So it is necessary to have both C and D to determine the amounts available for fiscal year 2015 through 2018. You must adjust the baseline and then D explains that you add to that baseline according to the schedule set out. This is the reading that is consistent with contemporaneous legislative history with the subsequent appropriations, the CDO score. See, I could understand all that if there was something to indicate to me that Congress understood that the aftereffects of the 2008 recession were hitting low-income people very hard. And therefore, in the 2014 amendment, having cut back on food stamps, Congress says we have to double the amount in this emergency food care. And we're going to taper off as time goes by. But for this first year, given this economic problem that's being experienced throughout the country, we need a big push the first year. And that's sort of what they wrote. And then they said, well, now that we've sort of filled in this gap and the economy is recovering, we can taper off as the periods go forward. Your Honor, if I may add one significant piece of context. As explained in our brief, the way that the SNAP, the food stamp program, and the TFAP program are appropriated, it's part of a lump sum. So to do that, to do what plaintiffs are suggesting, it would require the department to take more money out of the SNAP program and allocate it to the TFAP program. You understand, as I understand, that Congress appropriates a total dollar figure. But that appropriation is based on the submissions by the Office of Planning and Budget, OMB, indicating what those funds are to be used for. So it's not as though Congress is just saying to the department, here's a lump sum. It expects Congress to use the lump sum. It expects the agency to use the lump sum in the manner that the president has proposed through the submission prepared by OMB. I don't know where that gets you in this case. I mean, what I've posited as some explanation as to what Congress might be doing here with this extra language in D makes some sense to me. But the language itself, I don't know what you're doing with the C that's talking about years 2010 through 2018. And then saying, but for this three-year fiscal period, we're going to double up, basically. You're sort of ignoring that is what I'm getting at. I understand your point, and I thought Judge Millett's question to counsel about is there some principle that we should apply here where it's an appropriation and authorization. And therefore, the assumption that Congress doesn't want to bill the debt and violate debt ceilings, we would say, well, it must have meant a lower amount. But, you know, no brief gives us anything to go on. That's what's troubling to me about this whole case. I mean, I don't know who's right in one sense. We can come up with a legal analysis for going one way or another, and we'll talk it out among ourselves. But the briefs sort of aren't coming to grips with this. And what's troubling to me is you have the district court going one way. You have the government now on appeal going another way. Your Honor, I don't think our position is inconsistent with the district court. It's not on the bottom line, but how you get there is. Your Honor, both the district court and the government explain that this is a two-step calculation. The multiple cross-references between the two paragraphs are what require both the baseline amount and the addition of the scheduled amount. And those interpretations are the same. They get to the bottom line, and the logic is the same. The same bottom line, different way. And I thought counsel's brief before appellant suggests that quite clearly. And when you look at the district court, it accepts part of the argument of plaintiff. And you're not making that same argument to this court today. Your Honor, the argument embraced by the district court is the same as the argument embraced here, that these two sub-paragraphs govern the four fiscal years at issue, and that Congress's intent is plain. Is there anything in the legislative history that you've looked at that supports this hypothesis I raised about the lingering effects of the recession? Your Honor, I don't know that I can speak to the background of the recession on the farm bill negotiations. So is that an answer, that there's nothing in the legislative history to the farm bill that addresses its emergency food program in terms of the effects of the recession? Your Honor, I just am not prepared to speak to that specific point. That means what? That you haven't found it, or there's more to read that you haven't had a chance to read? The legislative history that we reviewed focuses on the tradeoffs between SNAP and TPAP. But to your specific point about whether Congress used the background of the Great Recession as a reason to increase or not, double or not, the amounts authorized for TPAP in a particular fiscal year, I would have to go back to the legislative history. So the House and Senate just tossed a coin? No, Your Honor. In fact, they were in agreement that the House and Senate versions of the authorization were these modest increases. The conference committee report makes that exact point. And this was part of a large and contentious debate about cuts. Well, you've read plenty of cases that say all this legislative history can't overcome the language that Congress actually passes. Now, Congress made a mistake. You can amend the language, but... And it hasn't done so, Your Honor. The agency has been operating under this interpretation. Well, maybe the plaintiff's point is the agency's wrong. And Congress hasn't corrected the error. There's been no suggestion that Congress disapproves of the agency's interpretation. In fact, we've had multiple indications that Congress embraces the interpretation that the agency has adopted. So a couple of times you said if Congress were doing what they wanted to, we'd expect them to be clear. There's nothing clear about the statute. But I'm wondering if you have an answer to my question about whether there's any either rule of statutory construction, narrow construction of spending authorizations, or background presumption that courts should have if they were to come to statutory language and find it ambiguous. Does a tie go to spending less, spending more, or there's just no relevant principle to be applied in this particular context? I'm unfamiliar with a statutory presumption that would do what Your Honor is suggesting. But we think that resort to such a presumption isn't necessary when... You think this language is clear? Yes, Your Honor. Then we don't need to look at your legislative history. I think that it's a straightforward way of doing what Congress intended. And, in fact, the legislative history is abundantly clear. Everyone agrees, the contemporaneous drafters, subsequent appropriators, the agencies. But we don't look at any of that under your theory. I mean, it's just odd that we have a situation where both parties are coming with diametrically opposed views, both insisting that the statute is absolutely clear, and I will confess that at least one judge thinks it's ambiguous. And so no one will tell me what to do with that ambiguity. Well, if there were such a judge who thought that it was ambiguous, then resort to the legislative history and the agency's practice would, I think, resolve that ambiguity. And the legislative history is clear. Plaintiff all but concedes that the legislative history supports the agency's interpretation. And you claim no agency deference, correct? In the district court, we- You claim no agency deference. I'm not saying what you said in the district court. We have not argued for that in our brief here. All right. Thank you. All right. Counsel for Appella. Thank you, Your Honors. A couple quick clean-up points to your question, Judge Rogers. I'd point you to pages 33 and 34 of the addendum. They are one-page, two separate one-page excerpts from the legislative history where representatives who were standing in support of the final bill explained why they believe that the food stamp program did not need to be cut, should not be cut by $8 billion, given the hunger problem, and that they were reluctantly supporting the bill because at least they thought that the TFAP program was going to compensate for a reasonable portion of that cut. Judge Millett, to the government's point about that they needed to draft the statute this way, Congress needed to draft it this way for the inflation calculator, I think you should take a look at sub E. Congress knew how to rewrite an inflation calculator when it wanted that to be done. It did so in the exact same bill in sub E. This case, though, I think is ultimately one that reinforces the principle that the best evidence of Congress's intent is the text. I mean, we could speculate. We could try to find something in the legislative history about what was going on, but it's clear there's a lot of moving parts. This farm bill is hundreds of pages long. We are dealing with what comes out to be a half of a page. The legislative history is hundreds of pages long. The idea that the legislative history reflects the intent or the will of the legislators is, I think, demonstrably false. The question really isn't why Congress did this. I know we'd like to find a reason why, but the question is what did Congress do? Because the fact is when you're dealing with numbers that are written in statutes, they're always a little bit arbitrary. Whether the number is how long for a statute of limitations, three years, four years, five years. What's the admissions threshold for getting a Clean Air Act permit? Is it 200 tons per year, 220 tons per year? How about spending on defense or education? The point is when it comes to picking a number in a statute, that's Congress's sole prerogative. And what we know, to come back, I guess, to Judge Millett's point, what we know here is that Congress every year, every year, has appropriated $80 billion for the food stamp program, of which the delta between our positions is one-third of 1%. The money is there. USDA, as we've pointed out in our brief, has on average about $3 to $4 billion unspent every year out of that $80 billion appropriation. Can I ask you a quick question? You said you teed this up as a petition for rid of mandamus. Why isn't APA relief perfectly sufficient? We believe it is. We pleaded those as the alternative, either for agency action unlawfully. Can you plead for a mandamus if you agree that there's an adequate statutory ground? Are those really alternatives that you can have, given what it takes to have mandamus? There's some precedent in the Ninth Circuit, which we've briefed below, that suggests you can plead both. But, yeah, we think that APA 7061 for agency action unlawfully withheld would be an adequate relief in this context. And that, indeed, whether it is a mandamus action or an APA action doesn't really ultimately affect the result. Because when an agency like USDA is acting in a way that is contrary to its mandatory nondiscretionary duty, relief is available from the court to direct it to do so. Unless the court has any further questions. Thank you. Thank you very much. I take the case under advisement.
judges: Rogers, Millett, Randolph